IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STEWART ANTELIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 10 C 5523 |
| v. ) | |
| ) | Magistrate Judge Nan R. Nolan |
| MICHAEL FREEMAN, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Stewart Antelis initiated this lawsuit against Defendant Michael Freeman alleging various securities fraud violations. In his Amended Complaint, Plaintiff claims violation of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78a-78mm *et seq.*, and Rule 10b-5, 17 C.F.R. § 240.10b-5 in Count I; violation of the Illinois Securities Law of 1953 ("Illinois Securities Act"), 815 ILCS § 5/1 *et seq.*, in Count II; violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois Consumer Fraud Act"), 815 ILCS § 505/2, in Count III; violation of common law fraud standards in Count IV; and violation of common law securities fraud standards in Count V. (Am. Compl. ¶¶ 43–66.) The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

Defendant has moved to dismiss Count I pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), and the Private Securities Litigation Reform Act of 1995

("PSLRA"), 15 U.S.C. § 78u-4. (Mot. to Dismiss 12–36.) Additionally, Defendant has moved to dismiss Counts II–V pursuant to Rules 12(b)(6) and 12(b)(1). (*Id.* 37–43.) Plaintiff has agreed to voluntarily dismiss Counts II and V, but argues that Defendant's motion must be denied as to Counts I, III and IV. (Resp. 22.) For the reasons set forth below, Defendant's Motion to Dismiss is granted in part.

## I. FACTS[1]

This suit stems from Plaintiff's investment of over $500,000 in promissory notes ("Notes"), constituting securities pursuant to the Exchange Act, which were sold by Bruce Teitelbaum and guaranteed by Teitelbaum's company, Vision Realty Partners, Ltd. ("Vision Realty"). (Am. Compl. ¶¶ 1, 30.) When Teitelbaum declared bankruptcy in 2010, Plaintiff lost his investment, which constituted nearly all of his lifesavings. (*Id.* ¶ 2.) Plaintiff alleges that Defendant made numerous material misrepresentations and concealed material facts from Plaintiff in order to induce Plaintiff to loan money to Teitelbaum for the operation of Vision Realty. (*Id.* ¶¶ 1–2.) In reality, Plaintiff contends that Vision Realty was a shell corporation designed to allow Teitelbaum to defraud investors with Defendant's assistance. (*Id.* ¶¶ 34–35.)

Prior to the Notes becoming worthless, Plaintiff and Defendant had been business partners and lifelong friends. (Am. Compl. ¶¶ 7, 8.) Since 1996, Plaintiff and Defendant had bought, sold and managed real estate together, and Plaintiff often relied on Defendant for financial and investment advice. (*Id.*) Plaintiff placed a

---

[1] The Court accepts as true all factual allegations in Plaintiff's complaint and draws all reasonable inferences in his favor. *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

great deal of trust in Defendant and allowed Defendant to receive Plaintiff's mail, pay Plaintiff's bills, and maintain power of attorney for Plaintiff in certain matters. (*Id.* ¶¶ 9, 10.) Plaintiff believes that beginning in October 2005, Defendant began abusing this position of trust by working with Teitelbaum to defraud Plaintiff out of his lifesavings. (*Id.* ¶¶ 1, 11.)

In an October 2005 meeting, Defendant spoke with Plaintiff and Plaintiff's cousin Mark Malen about purchasing promissory notes from Teitelbaum worth $333,333.33. (Am. Compl. ¶ 12.) Defendant explained that he would also be purchasing a note from Teitelbaum for $333,333.33 such that all three individuals would be equal investors. (*Id.* ¶¶ 13, 14, 24.) According to Plaintiff, Defendant repeatedly emphasized that Defendant, Plaintiff and Malen would all be treated the same with respect to their Teitelbaum investments. (*Id.*) During the meeting, Defendant also stated that the invested money would be used only for commercial and residential real estate development and that Plaintiff and Malen would receive a guaranteed return of 10 percent on their investment. (*Id.* ¶¶ 15, 16.) Defendant stressed that the investment was a "sure thing" because Teitelbaum was personally worth $42 million and was therefore "bullet proof." (*Id.* ¶¶ 17-20.) Based on Defendant's assurances, Plaintiff and Malen agreed to invest, and Defendant delivered their checks, along with his own, to Teitelbaum later that month. (*Id.* ¶ 23.)

Around October 18, 2005, Teitelbaim signed a promissory note for $333,333.33 payable to Plaintiff. (Am. Compl. ¶ 25.) Acting upon the advice of Defendant, Plaintiff agreed to renew this note in 2006, 2007 and again in 2008. *(Id.* ¶ 26.)* On De-

cember 22, 2006, Defendant persuaded Plaintiff to purchase a second promissory note from Teitelbaum worth $250,000. (*Id.* ¶ 28.) This second promissory note was renewed in part for $125,000 around October 1, 2008. (*Id.* ¶ 29.)

On April 30, 2010, Teitelbaum filed for bankruptcy, and Plaintiff has been denied payment on both Notes. (Am. Compl. ¶¶ 32, 34.) Plaintiff alleges that he has since learned that Defendant made material misrepresentations and failed to disclose material facts to Plaintiff at the time Plaintiff agreed to purchase the first Note from Teitelbaum. (*Id.* ¶¶ 1, 2, 11, 12, 31, 33–42.) Specifically, Plaintiff claims that in 2005, Teitelbaum was not worth $42 million as Defendant stated, but was in fact insolvent. (*Id.* ¶¶ 33, 40.) Therefore, Plaintiff maintains that everything Defendant told Plaintiff regarding Teitelbaum's excessive wealth and the security and likely success of his investment was false. (*Id.* at ¶¶ 33, 36, 40.) Further, Plaintiff asserts that his investment was not used for commercial and residential real estate as Defendant led him to believe; instead, Vision Realty was in actuality a shell corporation for Teitbaum's "[P]onzi-style scheme." (*Id.* ¶¶ 34, 35, 40.) Finally, Plaintiff claims that Defendant received in excess of $100,000 from Teitelbaum as a "kickback" in exchange for inducing Plaintiff and Malen to purchase and renew the promissory notes at issue. (*Id.* ¶¶ 31, 37, 39, 40.) Plaintiff contends Defendant never disclosed this arrangement to Plaintiff and instead falsely held himself out as an equal investor with Plaintiff and Malen. (*Id.* ¶¶ 1, 2, 11, 12–14, 24, 31, 33–42.)

Plaintiff asserts that Defendant knew his misstatements were false when he made them, or that at least Defendant had no factual basis for making the repre-

sentations, and that Defendant intentionally withheld information about the "kick-back" he was to receive from Teitelbam. (Am. Compl. ¶¶ 36, 40.) Plaintiff was unaware of the concealment of facts by Defendant and asserts that he would not have purchased or renewed the Notes had Defendant disclosed the misrepresentations and revealed the material facts. (*Id*. ¶ 41.) As a result, Plaintiff claims damages in excess of $500,000 for Defendant's allegedly fraudulent conduct. (*Id*. ¶¶ 46, 50, 56, 60, 66.)

## II. ANALYSIS

Defendant moves to dismiss Plaintiff's Amended Complaint in its entirety. (Mot. to Dismiss 7, 44.) In his response to Defendant's motion, Plaintiff voluntarily dismisses Counts II and V. (Resp. 22.) The remaining issues involve Counts I, III and IV, which allege violations of the Exchange Act, the Illinois Consumer Fraud Act, and common law fraud standards. (Amended Compl. ¶¶ 43–46, 51–60.)

### A. Count I—The Exchange Act

In Count I, Plaintiff seeks recovery under the Exchange Act and the corresponding regulations contained in Rule 10b-5. (Am. Complaint ¶¶ 43–46.) Defendant contends that Count I should be dismissed because: (1) the applicable statute of limitations has run, and (2) Plaintiff has failed to adequately plead the necessary elements of a cause of action under the Exchange Act. (Mot. to Dismiss 9.) The Court will address each argument in turn.

### 1. *Statute of Limitations*

As of 2002, all actions alleging a violation of the Exchange Act and Rule 10b-5 are required to be commenced "not later than the earlier of: (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." 28 U.S.C. §§ 1658(b)(1)–(2). The complaint in this case was filed on August 31, 2010, and the parties do not dispute that the action was brought within five years of the alleged fraud, which began in October 2005. However, Defendant contends that Count I is barred by the 2-year statutory period contained in § 1658(b)(1) because Plaintiff should have discovered "the facts constituting the violation" at the time he made the initial loan to Teitelbaum in October 2005. (Mot. to Dismiss 10–12.) Accordingly, Defendant states that the statute of limitations ran in October 2007, and Count I must be dismissed as untimely. (*Id*. 11–12.) The Court disagrees.

As a preliminary matter, a statute of limitations defense is not typically part of a Rule 12(b)(6) motion because complaints are not required to anticipate such affirmative defenses to survive a motion to dismiss. *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 847 (7th Cir. 2008); *U.S. v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005); *see also Tregenza v. Great Am. Commc'ns Co.*, 12 F.3d 717, 718 (7th Cir. 1993) ("The statute of limitations is an affirmative defense, and a plaintiff is not required to negate an affirmative defense in his complaint."). A Plaintiff in a securities fraud action is therefore not expected to include facts in his complaint showing that his suit has been timely filed. *Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.*, 137 F. Supp.2d 1114, 1125 (E.D. Wis. 2001) (citing *Tregenza*, 12 F.3d at 718). It is only in cases where a plaintiff has affirmatively

pleaded facts indicating his suit is time barred that a judge should grant a defendant's motion to dismiss. *Id.*; *see also Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 608 (7th Cir. 1995) ("[I]n the context of securities litigation, if a plaintiff pleads facts that show its suit is barred by a statute of limitations, it may plead itself out of court under a Rule 12(b)(6) analysis.") Thus, in assessing Defendant's motion to dismiss, the statute of limitations analysis is strictly limited to whether the *facts Plaintiff pleaded in his Amended Complaint* show that Count I was filed in violation of the 2-year statutory period described in § 1658(b)(1).

As stated above, § 1658(b)(1) requires federal securities fraud cases to be brought within "2 years after the discovery of the facts constituting the violation." 28 U.S.C. § 1658(b)(1). The Seventh Circuit test for determining the time at which such a discovery of the violation took place has long been held to be the point at which a plaintiff was put on "inquiry notice" of the fraud. *E.g.*, *Fujisawa Pharmaceutical Co. v. Kapoor*, 115 F.3d 1332, 1334 (7th Cir. 1997); *Whirlpool*, 67 F.3d at 609. "Inquiry notice" has been defined as when a potential plaintiff learns, or should have learned through the exercise of ordinary diligence, facts sufficiently probative of fraud that would induce a reasonable person to investigate whether he might have a claim. *Law v. Medco Research, Inc.*, 113 F.3d 781, 785 (7th Cir. 1997); *In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 526 (N.D. Ill. 2007) (citing *Fujisawa*, 115 F.3d at 1334–35.). Such inquiry notice is triggered by the occurrence of suspicious circumstances probative of fraud combined with access to the information necessary

to plead a securities fraud claim. *Fujisawa*, 115 F.3d at 1335; *Motorola*, 505 F. Supp. 2d at 526.

However, a recent United States Supreme Court case, *Merck & Co. v. Reynolds*, 130 S. Ct. 1784 (2010), overruled this analysis and held that "the discovery of facts that put a plaintiff on 'inquiry notice' does not automatically begin the running of the limitations period" described in § 1658(b)(1). *Id.* at 1798. The new test laid down by the *Merck* Court remains an objective one defined by the actions of a reasonable individual, but instead of focusing on when a reasonable investor would have *begun* investigating, the assessment considers when such a reasonable investor would have *actually uncovered* the facts constituting the fraud. *See City of Pontiac General Employees' Retirement System v. MBIA, Inc.*, 637 F.3d 169, 174 (2d Cir. 2011) (interpreting *Merck*). An analysis of inquiry notice, defined as "the time when the facts would have prompted a reasonably diligent plaintiff to begin investigating," remains relevant, but the limitations period will not begin running until the "plaintiff thereafter discovers or a reasonable plaintiff would have discovered the facts constituting the violation." *Merck*, 130 S. Ct. at 1798. The Supreme Court expressly declined to provide a full list of the "facts constituting [a securities fraud] violation," but did hold that "facts showing scienter," the required mental state in securities fraud cases, are definitively included among the facts that must be discovered before the limitations period begins to run. *Id.* at 1796. Such facts will show that the defendant acted with a "mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007).

In applying this new *Merck* standard to the case at hand, the Court finds that Count I is not time barred by § 1658(b)(1). There is nothing contained in the Amended Complaint indicating that Plaintiff should have discovered the facts constituting Defendant's alleged fraud, including scienter, more than two years prior to the date the suit was initiated. Defendant's position to the contrary is based on his belief that a reasonable investor would have uncovered Teitelbaum's alleged insolvency, the supposed kickback agreement, and Defendant's deception before agreeing to a loan that constituted most of the investor's life savings. (Mot. to Dismiss 11; Reply 4.) Thus, Defendant claims that Plaintiff should have discovered all relevant facts prior to making the initial Note purchase from Teitelbaum for $333,333.33, or at the very least, prior to purchasing the second Note. (Reply 4.)

Defendant's argument fails for two main reasons. First, the Supreme Court makes clear in *Merck* that the time at which a plaintiff *should* discover the facts that constitute the violation cannot take place before the plaintiff is *able* to discover such facts. 130 S. Ct. at 1797 ("Nothing . . . suggests that the limitations period can sometimes begin *before* discovery can take place."). Here, there is simply no evidence that Plaintiff would have had access to the relevant information even if he had endeavored to seek it out.

The Amended Complaint contains no indication that the finances of Vision Realty or Teitelbaum were publically available such that Plaintiff could have verified Teitelbaum's solvency. The only sources Plaintiff had for this information were Defendant and Teitelbaum themselves, both of whom are alleged to have conspired to

defraud Plaintiff by actively hiding the truth. (*See* Am. Complaint ¶1.) Further, it is unreasonable to suggest that Plaintiff should have discovered a *private* "kickback" arrangement between Defendant and Teitelbaum if they were inclined to hide it from him as the complaint alleges. (*See id*.) Thus, in 2005, considering only the Amended Complaint as the Court must on a motion to dismiss, Plaintiff did not have access to the key facts underlying the violation at issue, making it impossible not only for Plaintiff to collect necessary details of the actual fraud, but also to gather proof of Defendant's fraudulent intentions sufficient to show scienter. If Plaintiff did not even have access to the information indicating that Defendant was lying, Plaintiff certainly did not have access to information showing that Defendant was lying with the "intent to deceive, manipulate, or defraud." *See Tellabs*, 551 U.S.at 319. This lack of access to "the facts constituting the violation" supports the timeliness of Count I.

Additionally, and more fundamentally, not only did Plaintiff lack access to critical information, the Amended Complaint provides no indication that Plaintiff had any reason to even suspect fraud and begin looking for the relevant facts prior to Teitelbaum declaring bankruptcy in 2010. The *Merck* Court was clear that, even under its new statute of limitations standard, "inquiry notice" remains relevant because the limitations period begins to run when "the plaintiff *thereafter* discovers or a reasonably diligent plaintiff would have discovered" the facts constituting a fraud claim. 130 S. Ct. at 1798 (emphasis added). Thus, inquiry notice takes place prior to the running of the statute of limitations, and, as the Seventh Circuit has long held,

inquiry notice begins *following* the occurrence of a suspicious circumstance sufficiently probative of fraud to incite a reasonable investor to investigate. *Fujisawa*, 115 F.3d at 1335; *Motorola*, 505 F. Supp. 2d at 526.

In this case, the Amended Complaint contains no evidence of such a suspicious circumstance prior to April 2010, mere months before the present suit was filed. Plaintiff aserts that Defendant was a life-long friend and long-time business partner and advisor. (Am. Compl. ¶¶ 7, 8.) Defendant often provided investment advice to Plaintiff and "assisted and coordinated financial investments on Plaintiff's behalf." (*Id*. ¶ 8.) Given this background, there was nothing suspicious or indicative of fraudulent intent when Defendant presented Plaintiff with the business deal in October 2005. Defendant simply provided advice to Plaintiff about the Teitelbaum investment, just as he had done for Plaintiff regarding other investments in the past. (*Id*.) Additionally, there was no reason for Plaintiff to suspect fraud in the years following Plaintiff's initial loans to Teitelbaum merely because Plaintiff continued to agree to renew the loans at Defendant's suggestion. (*See id*. ¶ 26.) There is nothing inherently suspicious about loan renewal advice. It was not until Teitelbaum filed for bankruptcy and Plaintiff was actually denied payment on the Notes that Plaintiff could, and should, have known that something potentially fraudulent had taken place. Plaintiff cannot be expected to have discovered "the facts constituting the violation," including that Plaintiff's life-long friend had deceived him with the requisite scienter, prior to Plaintiff receiving any indication that a violation might have even

taken place. Therefore, the Court concludes that Plaintiff has not plead himself out of court under § 1658(b)(1) and declines to dismiss Count I as untimely.

### 2. *Failure to State a Claim*

Defendant next contends that Count I should be dismissed for failure to state a claim pursuant to Rule 12(b)(6). (Mot. to Dismiss 9, 12.) Defendant argues that Plaintiff has failed to adequately plead any of the necessary elements that comprise a cause of action under the Exchange Act. (*Id*. 9, 12–13.)

#### a. *Applicable Legal Standards*

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the sufficiency of the complaint, not to decide its merits. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). A Rule 12(b)(6) motion to dismiss must be considered in light of the liberal pleading standard of Rule 8(a)(2), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." "Specific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (internal citations and alterations omitted). Determination of the sufficiency of a claim must be made "on the assumption that all allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (emphasis omitted).

Nevertheless, a motion to dismiss should be granted if the plaintiff fails to make allegations that are "enough to raise a right to relief above the speculative level" and are sufficient to show "a plausible entitlement" to recovery under a viable legal

theory. *Twombly*, 550 U.S. at 555, 559 (While the court must accept factual allegations as true, it need not credit mere labels, conclusions or "formulaic recitation of the elements of a cause of action."); *EEOC v. Concentra Health Svcs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (The complaint's "allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level;' if they do not, the plaintiff pleads itself out of court."). However, "[a] plaintiff need not put all of the essential facts in the complaint," *Hrubec v. Nat'l R.R. Passenger Corp.*, 981 F.2d 962, 963 (7th Cir. 1992); instead, the plaintiff "may add them by affidavit or brief in order to defeat a motion to dismiss if the facts are consistent with the allegations of the complaint," *Help at Home Inc. v. Medical Capital, LLC*, 260 F.3d 748, 752–53 (7th Cir. 2001); *see Cruz v. Cross*, 2010 WL 3655992, at *2 (N.D. Ill. 2010).

While "detailed factual allegations" are not required, the plaintiff must allege facts that, when "accepted as true, . . . state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*,  129 S. Ct. 1937, 1949 (2009) (internal citation and quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563.

Because Count I deals with the Exchange Act, the sufficiency of Plaintiff's claim is also governed by Rule 9(b). *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990) ("It

is well settled that Rule 9(b) . . . governs claims based on fraud and made pursuant to the federal securities laws."). Rule 9(b) is intended to force plaintiffs alleging fraud to do more than the usual investigation prior to filing a complaint, and therefore requires such plaintiffs to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *accord Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999). For a complaint to be sufficiently "particular" it must include "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992). In essence, this requires a plaintiff to plead the "who, what, when, where, and how" of the allegedly fraudulent actions. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990); *see Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs.*, 536 F.3d 663, 668 (7th Cir. 2008) (The circumstances of fraud or mistake include the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.") (citation omitted).

In addition, a complaint alleging securities fraud is also subject to the heightened pleading standards set forth in the PSLRA. Under this statute, a securities fraud complaint must specify "each statement alleged to have been misleading, the . . . reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state

with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Further, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u-4(b)(2).

### b. Application

In Count I, Plaintiff alleges that Defendant committed securities fraud in violation of the Exchange Act and the corresponding regulations contained in Rule 10b-5. (Am. Compl. ¶¶ 43–46.) The Exchange Act states in pertinent part that it is unlawful for any person "[t]o use or employ, in connection with purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange Commission] may prescribe." 15 U.S.C. § 78j(b) One such regulation is Rule 10b-5 which, in connection with the purchase or sale of securities, prohibits: (1) making any untrue statement of material fact; or (2) omitting the mention of any material fact such that other statements made become misleading. 17 C.F.R. § 240.10b-5. Rule 10b-5 also provides that it is unlawful to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." *Id.*

To state a valid Rule 10b-5 claim, a plaintiff must allege that: (1) the defendant made a material misstatement or omission (2) with scienter, (3) in connection with the purchase or sale of a security, (4) upon which the plaintiff relied, (5) resulting in economic loss and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 131 S.

Ct. 1309 (2011). Defendant contends that Count I "fails to demonstrate *any* of the necessary elements that comprise a cause of action under Rule 10b-5." (Mot. to Dismiss 13.) Because Plaintiff has clearly failed to adequately plead scienter, the Court declines to address the remaining five elements of the claim and dismisses Count I with leave to amend.

A valid complaint must adequately allege that the defendant acted with scienter, "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193–94 & n.12 (1976)). The Seventh Circuit has established that scienter can be shown either through intentional statements of known falsehoods or through the reckless disregard for the truth. *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008). Recklessness in this context "should be viewed as the functional equivalent of intent," *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977), and is defined as an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or was so obvious that the defendant must have been aware of it. *Makor*, 513 F.3d at 704.

As explained above, the PSLRA requires a plaintiff to state with particularity facts giving rise to a "strong inference" that the defendant acted with scienter. 15 U.S.C. § 78u-4(b)(2). The current standard for what constitutes such an inference is the Supreme Court's *Tellabs* decision. The *Tellabs* Court presented three prescriptions for lower courts assessing the sufficiency of scienter pleading in securities

fraud cases. First, as with any Rule 12(b)(6) motion to dismiss, courts must accept all factual allegations in the complaint as true. 551 U.S. at 322. Second, courts must consider the complaint in its entirety to determine whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id* at. 323. Finally, courts must take into account plausible innocent explanations for the defendant's conduct, and a complaint will be sufficient only if the inference of scienter is "*at least as likely*" as any plausible opposing inference. *Id.* at 328. In sum, reviewing courts must ask the following question: "When the allegation are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inferences?" *Id.* at 326.

Although the Supreme Court declined to apply this new scienter standard to the facts in *Tellabs*, the Court has recently provided such an analysis in *Matrixx*, a case alleging that Matrixx had fraudulently concealed reports documenting a possible connection between its leading product and a consumer health detriment. 131 S. Ct. at 1311, 1323–25. In reaching its decision that the plaintiff had adequately pleaded scienter, the Court weighed the inference that Matrixx had acted recklessly or intentionally in withholding the disputed documents against the opposing inference that the corporation simply did not think the reports contained meaningful information. *Id.* at 1324. The Court rejected Matrixx's argument that because the plaintiff did not allege that Matrixx knew of any statistically significant evidence of detrimental causation, the plaintiff had not sufficiently alleged scienter. *Id.* Instead, the

*Matrixx* Court found more compelling the plaintiff's allegations that: (1) the corporation had hired its own consultant and panel of scientists to review the product for the health defect at issue following its discovery of the reports, but did not inform the public of its concerns; (2) that it asked to have animal studies performed on the product after learning of the reports, but still did not inform the public of the concerns; and (3) that it issued a press release suggesting that studies had confirmed that the product did *not* cause the defect when the corporation had not actually conducted any studies and the scientific evidence available at the time was inconclusive. *Id*. Taken collectively, the Court held that these allegations gave rise to a compelling inference that "Matrixx elected not to disclose the reports of adverse events not because it believed they were meaningless but because it understood their likely effect on the market." *Id*. at 1324–25.

The Seventh Circuit reached a different conclusion when it recently considered this issue in *Pugh v. Tribune Co.*, 521 F.3d 686 (7th Cir. 2008). In *Pugh*, shareholders of the newspaper publishing company Tribune Co. brought suit against the company and five executive officers, among others, alleging that the company had committed securities fraud by publically providing inflated newspaper circulation figures that had been exaggerated by a subsidiary attempting to increase its advertising revenue. *Id*. at 690. There was no question that the subsidiary had intentionally boosted figures; the court nevertheless held that the inference that Tribune Co. itself had acted with scienter was not sufficiently cogent or compelling to withstand the defendants' motion to dismiss. *Id*. at 694–95.

The Seventh Circuit explained that even though Tribune had access to the subsidiary's underlying financial information, simply having access does not provide evidence of an intent to deceive. *Pugh*, 521 F.3d at 694. "There is a big difference between knowing about . . . reports from [a subsidiary] and knowing that the reports are false." *Id*. Additionally, although the plaintiffs argued that Tribune's internal circulation controls must have been recklessly weak considering that a fraud was actually able to take place, the court was clear that this "fraud by hindsight argument" was impermissible and could not be the basis of proving scienter. *Id*. The Seventh Circuit further refused to find a showing of scienter based on the plaintiffs' claim that Tribune was motivated to permit "lax" internal controls to allow the officers to maximize returns from the exercise of stock options and sales of inflated stock. *Id*. at 695. The court reasoned that for stock sales to constitute evidence of scienter, the sales must be unusual or suspicious, but plaintiffs had provided no evidence of either situation. *Id*. Additionally, because the plaintiffs had merely alleged that stock options were exercised, but had not alleged that those stocks were subsequently sold, the likely inference was that the executives themselves stood to lose a lot of money at the time that this fraud came to light. *Id*. Finally, the Court noted that as soon as Tribune was alleged to have had actual knowledge of the accusations of fraud against the subsidiary, it promptly commenced an internal investigation to discover the truth, promptly terminated the responsible parties, and continuously kept the public apprised of the actions it was taking and the information it was uncovering. *Id*. Tribune did "exactly what they should have done" and the

Seventh Circuit therefore held that the plaintiffs' allegations did not add up to a strong showing of scienter that was at least as compelling as an innocent explanation for Tribune's conduct. *Id.* at 694–95.

Similarly, in the instant case, Plaintiff's Amended Complaint fails to provide a compelling inference of scienter. There is no question that in describing Defendant's conduct, Plaintiff uses the correct language alleging scienter. (Am. Compl. ¶¶ 36, 40) (alleging that Defendant was aware that his material statements were false when he made them, or, alternatively, that Defendant had "no basis whatsoever" for making the material misrepresentations.) However, conclusory allegations of intentional or reckless deceit and manipulation are not enough; the complete story told by the complaint must back up the allegations to create the strong inference of scienter required by the PSLRA. *See Tellabs*, 551 U.S. at 313–14; *Pugh*, 521 F.3d at 694. To that end, Plaintiff claims that Defendant's culpable state of mind is adequately pled through allegations that: (1) Defendant failed to disclose that he was to receive "kickbacks" for convincing Plaintiff to loan money to Teitelbaim; (2) Defendant falsely claimed that he was an equal investor in Teitelbaum's real estate venture; and (3) Defendant made false statements regarding Teitelbaum's wealth and the likely success of Plaintiff's investment. (Resp. 17–18.) Plaintiff argues that these allegations sufficiently show that Defendant acted with the requisite intent to defraud Plaintiff by inducing him to invest nearly all of his life savings in worthless promissory notes. (Am. Compl. ¶¶ 1–2.) The Court is not persuaded.

As *Tellabs* makes clear, while the Court must accept all factual allegations in Plaintiff's Amended Complaint as true, the Court must also consider the complaint in its entirety and consider plausible opposing inferences regarding Defendant's conduct. 551 U.S. at 322–23. In the end, the inference of scienter must be cogent and at least as compelling as any opposing inference that can be drawn from the facts alleged. *Id*. at 324. Here, viewed in its entirety, the Amended Complaint fails to give rise to a theory of scienter that is either cogent or sufficiently compelling. Plaintiff contends that Defendant received approximately $100,000 in "kickbacks" from Teitelbaum in exchange for inducing Plaintiff to purchase the Notes. (Am. Compl. ¶¶ 13, 14, 24, 37.) However, Plaintiff acknowledges that at the time of his initial loan to Teitelbaum, he and Defendant had been life-long friends and long-time business partners. (*Id*. ¶ 7.) The two were so close that they bought, sold, and managed real estate together, and Defendant even received Plaintiff's mail, was a signatory on one of Plaintiff's checking accounts, paid Plaintiff's bills, and had power of attorney for Plaintiff in certain matters. (*Id*. ¶¶ 7–9.) Plaintiff also acknowledges that Defendant bought a note from Teitelbaum for $333,333.33 at the same time that Plaintiff made his own purchase. (*Id*. ¶¶ 13, 14, 24, 37.)

Taken together, these facts fail to present a cogent or compelling theory of scienter. Even assuming, as the Court must on a motion to dismiss, that Teitelbaum was insolvent in October 2005 and that Defendant misstated and withheld information, it is not rational to suggest that Defendant was willing to voluntarily throw away $333,333.33 of his own money on a known sham venture for no other reasons

than the possibility of receiving kickbacks valuing less than one third of his initial loan and the chance to scheme his life-long friend out of his life savings. Defendant may have misstated information and he may have failed to disclose the kickback arrangement, but there is no coherent theory suggesting that he did so in order to defraud his friend out of over $500,000.

Unlike in *Matrixx*, where the Supreme Court was able to point to numerous and pervasive examples of allegations throughout the complaint that combined to create a strong inference that the defendant corporation withheld the disputed reports with scienter, 131 S. Ct. at 1323–25, here we merely have Plaintiff's isolated claims that Defendant intentionally or recklessly made material misstatements or omissions. The complaint taken as a whole and the circumstances presented tell a different story. In fact, the instant case is more analogous to that in *Pugh* where, as here, the accused parties took actions that provided strong, concrete evidence that they had not been acting with the requisite scienter. Because of actions taken by the defendants such as prompt internal investigations and corrective public disclosures, the *Pugh* Court was persuaded that an innocent explanation for the defendants' statements was more compelling than that they acted with scienter. 521 F.3d at 695. Here, based on the fact that Defendant put over $300,000 of his own money on the table as part of a mutual investment with his life-long friend, this Court is similarly persuaded that Defendant's actions speak to a nonculpable explanation for Defendant's alleged misstatements and omissions. (Am. Compl. ¶¶ 7–9, 13, 14, 24, 37.) Just like in *Pugh*, where the Seventh Circuit held that the inference of scienter was

belied by the fact that the defendants themselves likely stood to lose money as a result of the actions they were alleged to have taken, 521 F.3d at 695, it is not cogent to suggest that Defendant acted with scienter but nevertheless voluntarily set himself up to lose such a large sum of his own money.

As Defendant aptly states, the "Amended Complaint offers no explanation for why [Defendant] would intentionally go to such lengths and make such a personal financial sacrifice to lure his friend into throwing away nearly half a million dollars." (Mot. to Dismiss 30.) A much more compelling inference is that Defendant believed that the information he was providing to Plaintiff regarding Teitelbaum and Vision Realty was true and that Defendant in fact intended both he and his friend to make money on their investments. Looking at the Amended Complaint in its entirety, it is more plausible that Defendant was as shocked as Plaintiff to learn that Teitelbaum was in fact bankrupt and the promissory notes were worthless.

Plaintiff's allegations of scienter are further undermined by the documents attached to his Response to the Motion to Dismiss. On a Rule 12(b)(6) motion to dismiss, the court generally must confine its inquiry to the factual allegations set forth within the four corners of the operative complaint. *See Rosenblum v. Travelbyus.com*, 299 F.3d 657, 661 (7th Cir. 2002); *Hostway Corp. v. JPMorgan Chase Bank, N.A.*, 2009 WL 2601359, at *5 (N.D. Ill. 2009). Therefore, in the usual case, if a motion to dismiss includes additional materials, the court must either ignore the documents or convert the motion to one for summary judgment. *See* Fed. R. Civ. Pro. 12(d); *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th

Cir. 1993); *Hostway*, 2009 WL 2601359, at *5. However, in the Seventh Circuit, a narrow exception exists: "the court can consider documents attached to a motion to dismiss if the document is part of the pleadings that are referred to in the plaintiff's complaint, are central to his claim, and are properly authenticated (or authenticity is conceded)." *Markin v. Chebemma, Inc.*, 2010 WL 1191868, at *5 (N.D. Ill. 2010); *see Tierney v. Vahle*, 304 F.3d 734, 738–39 (7th Cir. 2002). Similarly, the court can consider documents submitted in response to a motion to dismiss if they are consistent with the complaint. *See Harrell v. United States*, 13 F.3d 232, 236 (7th Cir. 1993). The Seventh Circuit "has been relatively liberal in its approach to the rule articulated in *Tierney* and other cases." *Hecker v. Deere & Co.*, 556 F.3d 575, 582 (7th Cir. 2009); *e.g.*, *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1248 (7th Cir. 1994) (upholding consideration of an agreement quoted in the complaint and central to the question whether a property interest existed for purposes of 42 U.S.C. § 1983); *Venture Assocs.*, 987 F.2d at 431 (admitting letters, to which the complaint referred, that established the parties' contractual relationship); *Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.*, 805 F.2d 732, 739 (7th Cir. 1986) (permitting reference to a welfare plan referred to in the complaint in order to decide whether the plan qualifies under ERISA).

Here, attached to Plaintiff's Response are letters from Teitelbaum to Defendant that document the commission Defendant was to receive from Teitelbaum. (Resp. Exs. A, B.) These documents are consistent with the allegations in the complaint that Defendant received "kickbacks" in exchange for inducing Plaintiff and Malen to

purchase and renew the promissory notes. (*See* Am. Compl. ¶¶ 1, 31, 36–40.) Therefore, the Court will consider the documents without converting the motion to dismiss into one for summary judgment. *Harrell*, 13 F.3d at 236.

Unfortunately for Plaintiff, the exhibits also indicate that Defendant would not receive his commission/"kickback" prior to the "maturity and retirement" of Plaintiff's and Defendant's promissory notes. (Resp. Exs. A, B.) Thus, if Defendant had known Teitelbaum was insolvent in October 2005 as Plaintiff alleges, Defendant also knew that he was never going to see his "kickback" because the notes would never be repaid. These documents not only directly undermine Plaintiffs' claim that Defendant was motivated to defraud Plaintiff in order to receive "kickbacks," they also provide further support for concluding that an innocent explanation is more plausible than that Defendant acted with scienter with regard to the Teitelbaum investment.

For all of these reasons, Plaintiff's Amended Complaint fails to sufficiently allege scienter, a required element of a valid Rule 10b-5 claim. Therefore, Count I is dismissed with leave to amend. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").

## B. Counts III and IV—The Illinois Consumer Fraud Act and Common Law Fraud

In Count III, Plaintiff seeks recovery under the Illinois Consumer Fraud Act, and in Count IV, Plaintiff alleges that Defendant's actions constitute common law fraud. (Am. Compl. ¶¶ 51–60.) Defendant contends that both counts must be dismissed: (1) pursuant to Rule 12(b)(1) because the Court lacks subject matter juris-

diction over these state law claims; and (2) pursuant to Rule 12(b)(6) because Plaintiff has failed to adequately state claims upon which relief can be granted. (Mot. to Dismiss 37, 39–43.)

It is well established that the burden of establishing proper federal subject matter jurisdiction rests on the party asserting it. *Muscarello v. Ogle County Bd. of Comm'rs*, 610 F.3d. 416, 425 (7th Cir. 2010). In his Amended Complaint, Plaintiff alleges that subject matter jurisdiction over Counts III and IV is proper for two reasons. (Am. Compl. ¶ 3.) First, because Count I constitutes a clear federal cause of action, Plaintiff contends that this Court has supplemental jurisdiction over the state law claims contained in Counts III and IV pursuant to 28 U.S.C. § 1367. (*Id.*) However, having dismissed Count I—the sole federal claim, the Court declines to exercise supplemental jurisdiction over the remaining state law claims. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."). Consequently, we are left with Plaintiff's second basis for subject matter jurisdiction, namely that the court has diversity jurisdiction over the matter pursuant to 28 U.S.C. § 1332. (Am. Compl. ¶ 3.) Such jurisdiction is appropriate only where, as Plaintiff alleges, complete diversity of citizenship exists between Plaintiff and Defendant and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a); *Nuema, Inc. v. AMP, Inc.* 259 F.3d 864, 881 (7th Cir. 2001); (*see* Am. Compl. ¶¶ 3, 5–6).

Rule 12(b)(1) provides for the dismissal of an action or claim based on the lack of subject matter jurisdiction. Facial challenges require only that the court look to the complaint and see if the plaintiff has sufficiently *alleged* a basis of subject matter jurisdiction. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). In such cases, the motion to dismiss is analyzed as any other motion to dismiss by assuming that the allegations in the complaint are true. *United Phosphorus, Ltd. v. Angus Chemical Co.*, 322 F.3d 942, 946 (7th Cir. 2003).

In contrast, factual challenges to jurisdiction occur when the complaint is formally sufficient but the contention is that there is *in fact* no subject matter jurisdiction. *Apex*, 572 F.3d at 444. For these factual challenges, the court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists. *United Phosphorus*, 322 F.3d at 946; *Villlasenor v. Indus. Wire & Cable, Inc.*, 929 F. Supp. 310, 312 (N.D. Ill. 1996); *see also Gafron Corp. v. Hausermann*, 602 F.2d 781, 783 (7th Cir. 1979) ("The district court is not bound to accept as true the allegations of the complaint which tend to establish jurisdiction where a party properly raises a factual question concerning the jurisdiction of the district court to proceed with the action."). The burden of proof on a Rule 12(b)(1) issue rests on the party asserting jurisdiction who must establish the necessary facts by a preponderance of the evidence. *Muscarello*, 610 F.3d.at 424; *United Phosphorus*, 322 F.3d at 946.

Here, Plaintiff asserts that the two parties are citizens of different states—Plaintiff of Illinois and Defendant of Florida—and that the amount in controversy exceeds $75,000. (Amended Compl. ¶¶ 2, 3, 5–6.) Defendant, however, contends that he is not a citizen of Florida. (Mot. to Dismiss 37.) In support of his contention, Defendant submits two documents. First, Defendant provides an affidavit stating that his "residence" has always been in Illinois at all times relevant to the case. (*Id*. Ex. B.) However, "residence and citizenship are not synonyms and it is the latter that matters for purposes of diversity jurisdiction." *Meyerson v. Harrah's East Chicago Casino*, 299 F.3d 616, 617 (7th Cir. 2002). An allegation of residency without citizenship is insufficient to address Plaintiff's allegation of diversity jurisdiction. *See Simon v. Allstate Employee Group Med. Plan*, 263 F.3d 656, 658 n. 1 (7th Cir. 2001).

Second, Defendant attaches an of Affidavit of Special Process Server indicating that the service of Defendant in this case was purported to be done through abode service at his address in Illinois. (Mot. to Dismiss Ex. C.) While this document certainly provides evidence that Plaintiff intended to find Defendant at his Illinois address, it too falls short of concrete proof of Defendant's Illinois citizenship. However, the two documents taken together do call the propriety of diversity jurisdiction into question. Nevertheless, although the burden of proof on this 12(b)(1) issue rests with Plaintiff, *see United Phosphorus*, 322 F.3d at 946, in his Response to Defendant's Motion to Dismiss, Plaintiff failed to provide *any* evidence to rebut Defendant's challenge to diversity jurisdiction.

In situations where the subject matter jurisdiction of the court is challenged, the court's job is to assess the evidence to determine whether jurisdiction actually exists. *Hemmings v. Barian*, 822 F.2d 688, 693 (7th Cir. 1987); *Villlasenor*, 929 F. Supp. at 312. As explained by the Seventh Circuit in *Hemmings*, "the proper course is not to dismiss outright but to determine whether federal jurisdiction in fact exists." 822 F.2d at 693. Here, however, Defendant's inconclusive documents and Plaintiff's silence prevents the Court from properly assessing the existence of diversity jurisdiction. Therefore, the Court opts to follow the path taken by the Seventh Circuit in *Hemmings* which, when presented with similarly inconclusive jurisdictional evidence, decided that the "correct response is to put the plaintiff to his proof." *Id*.

In amending his complaint, if Plaintiff wishes to assert diversity jurisdiction, he should include evidence in support of his contention that Defendant is a citizen of Florida.

### III. CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss [27] is **GRANTED IN PART**. Count I of the Amended Complaint is **DISMISSED WITH LEAVE TO AMEND**. At Plaintiff's request, Counts II and V of the Amended Complaint are **DISMISSED WITHOUT PREJUDICE**. Plaintiff is given further leave to amend his jurisdictional allegations consistent with this Order. An amended complaint shall be filed within 14 days of the entry of this Order.

E N T E R:

Dated: June 29, 2011

_Nan R. Nolan_

_____

NAN R. NOLAN
United States Magistrate Judge