# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| STEWART ANTELIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **No. 10 C 5523** |
| v. | ) | |
| | ) | **Magistrate Judge Nan R. Nolan** |
| MICHAEL FREEMAN, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Stewart Antelis initiated this lawsuit against Defendant Michael Free-

man alleging various securities fraud violations. In his Second Amended Complaint,

Plaintiff claims violation of the Securities Exchange Act of 1934 ("Exchange Act"),

15 U.S.C. §§ 78a-78mm *et seq*., and Rule 10b-5, 17 C.F.R. § 240.10b-5, in Count I;

violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Il-

linois Consumer Fraud Act"), 815 ILCS § 505/2, in Count II; and violation of com-

mon law fraud standards in Count III.[1] (Compl. ¶¶ 62–75.)[2] The parties have con-

sented to the jurisdiction of the United States Magistrate Judge pursuant to 28

U.S.C. § 636(c).

On June 29, 2011, the Court dismissed, with leave to amend, Count I of the First

Amended Complaint for failure to state a claim. On July 13, 2011, Plaintiff filed a

---

[1] The First Amended Complaint also included claims that Defendant violated (i) the Il-
linois Securities Law of 1953 and (ii) common law securities fraud standards, both of which
Plaintiff has voluntarily dismissed.

[2] Citations to the Complaint are to the Second Amended Complaint.

Second Amended Complaint. On August 30, 2011, Defendant filed a Motion to Dismiss the Second Amended Complaint. Defendant moves to dismiss Count I pursuant to Federal Rules of Civil Procedure 12(b)(6). (Mot. 9–46.) Additionally, Defendant moves to dismiss Counts II and III pursuant to Rules 12(b)(6) and 12(b)(1). (*Id.* 46–54.) For the reasons set forth below, Defendant's Motion to Dismiss is granted.

## I. FACTUAL ALLEGATIONS[3]

Plaintiff and Defendant were lifelong friends. (Compl. ¶ 14.) Since 1996, Defendant was also Plaintiff's partner in numerous investments. (*Id.* ¶¶ 1, 14.) Beginning in 2005, Defendant convinced Plaintiff to invest over $500,000 in promissory notes ("Notes"), constituting securities pursuant to the Exchange Act, which were sold by Bruce Teitelbaum and guaranteed by Teitelbaum's company, Vision Realty Partners, Ltd.[4] (*Id.* ¶¶ 1, 23, 35, 36.) When Teitelbaum declared bankruptcy in 2010, Plaintiff lost his investment, which constituted nearly all of his lifesavings. (*Id.* ¶ 3.)

Plaintiff alleges that Defendant made numerous material misrepresentations and concealed material facts in order to induce Plaintiff to loan money to Teitelbaum for the operation of Vision Realty. (Compl. ¶ 2.) Plaintiff contends that Vision Realty was a shell corporation designed to allow Teitelbaum to defraud investors with Defendant's assistance. (*Id.* ¶¶ 20, 48–50.) Plaintiff also asserts that Defendant received hundreds of thousands of dollars in kickbacks and other payments

---

[3] The Court accepts as true all factual allegations in Plaintiff's Complaint and draws all reasonable inferences in his favor. *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

[4] Neither Teitelbaum nor Vision Realty are parties in this lawsuit.

from Teitelbaum as incentives to induce Plaintiff to purchase the Notes and renew them on an annual basis. (*Id.* ¶ 2)

Prior to the Notes becoming worthless, Plaintiff and Defendant had been business partners and lifelong friends. (Compl. ¶¶ 1, 14.) Since 1996, Plaintiff and Defendant had bought, sold and managed real estate together, and Plaintiff often relied on Defendant for financial and investment advice. (*Id.* ¶¶ 1, 14, 15, 17, 60.) Plaintiff placed a great deal of trust in Defendant and allowed Defendant to receive Plaintiff's mail, pay Plaintiff's bills, and maintain power of attorney for Plaintiff in certain matters. (*Id.* ¶ 17.) Beginning in October 2005, Plaintiff alleges that Defendant began abusing this position of trust by working with Teitelbaum to defraud Plaintiff out of his lifesavings. (*Id.* ¶¶ 1, 19–22.)

In an October 2005 meeting, Defendant spoke with Plaintiff and Plaintiff's cousin Mark Malen about purchasing promissory notes from Teitelbaum, which were each worth $333,333.33. (Compl. ¶ 23.) Defendant explained that he would also be purchasing a note from Teitelbaum for $333,333.33 such that all three individuals would be equal investors. (*Id.* ¶¶ 24, 25, 33.) During the meeting, Defendant also stated that the invested money would be used only for commercial and residential real estate development and that Plaintiff and Malen would receive a guaranteed return of ten percent on their investment. (*Id.* ¶¶ 26, 27.) Defendant stressed that the investment was a "sure thing" because Teitelbaum was personally worth $42 million and was therefore "bullet proof." (*Id.* ¶¶ 28–31.) Based on Defendant's

assurances, Plaintiff and Malen each agreed to invest, and later that month, Defendant delivered their checks, along with his own, to Teitelbaum. (*Id*. ¶¶ 32, 33.)

On or about October 18, 2005, Teitelbaim signed a promissory note for $333,333.33 payable to Plaintiff. (Compl. ¶ 35, Ex. E.) Acting upon the advice of Defendant, Plaintiff agreed to renew this note in 2006, 2007, and again in 2008. (*Id*. ¶¶ 38, 41.) On December 22, 2006, Defendant persuaded Plaintiff to purchase a second promissory note from Teitelbaum worth $250,000. (*Id*. ¶ 36, Ex. F.) This second promissory note was renewed in part for $125,000 on or about October 1, 2008. (*Id*. ¶¶ 40, 41.) Each time the Notes were due, Defendant induced Plaintiff to renew the Notes rather than collect payment on them. (*Id*. 41, 43.)

On April 30, 2010, Teitelbaum filed for bankruptcy, and Plaintiff has been denied payment on both Notes. (Compl. ¶¶ 3, 49.) Plaintiff has since learned that Defendant made material misrepresentations and failed to disclose material facts at the time Plaintiff agreed to purchase the first Note from Teitelbaum. (*Id*. ¶¶ 1, 23–31, 34, 46, 48–51, 55, 57–61.) Specifically, Plaintiff claims that in October 2005, Teitelbaum was not worth $42 million as Defendant stated, but was in fact insolvent. (*Id*. ¶¶ 28, 48, 50, 55, 57.) Therefore, Plaintiff maintains that everything Defendant told Plaintiff regarding Teitelbaum's wealth and the security and likely success of his investment was false. (*Id*. at ¶¶ 26, 28–31, 57.)

Further, Plaintiff asserts that his investment was not used for commercial and residential real estate as Defendant led him to believe; instead, Vision Realty was in actuality a shell corporation for Teitelbaum's "[P]onzi-style scheme." (Compl. ¶¶

27, 49, 50, 57.) Finally, Plaintiff claims that Defendant received in excess of $200,000 from Teitelbaum as "kickbacks" in exchange for inducing Plaintiff and Malen to purchase and renew the promissory notes. (*Id.* ¶¶ 2, 20–22, 34, 39, 42, 46, 52–56, 58 & Exs. B, C, J.) Defendant never disclosed this arrangement to Plaintiff and instead falsely held himself out as an equal investor with Plaintiff and Malen. (*Id.* ¶¶ 24, 25, 33, 34, 57.)

Plaintiff asserts that Defendant knew his misstatements were false when he made them, or that at least Defendant had no factual basis for making the representations, and that Defendant intentionally withheld information about the "kickbacks" he was to receive from Teitelbam. (Compl. ¶¶ 48, 51.) Plaintiff was unaware of the concealment of facts by Defendant and asserts that he would not have purchased or renewed the Notes had Defendant disclosed the misrepresentations and revealed the material facts. (*Id.* ¶¶ 58, 51.) As a result, Plaintiff claims damages in excess of $500,000. (*Id.* ¶¶ 1, 3, 65, 71, 75.)

## II. DISCUSSION

### A. Applicable Legal Standard

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the sufficiency of the complaint, not to decide its merits. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). A Rule 12(b)(6) motion to dismiss must be considered in light of the liberal pleading standard of Rule 8(a)(2), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." "Specific facts are not necessary; the statement need only give the defendant fair

notice of what the claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (internal citations and alterations omitted). Determination of the sufficiency of a claim must be made "on the assumption that all allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (emphasis omitted).

Nevertheless, a motion to dismiss should be granted if the plaintiff fails to make allegations that are "enough to raise a right to relief above the speculative level" and are sufficient to show "a plausible entitlement" to recovery under a viable legal theory. *Twombly*, 550 U.S. at 555, 559 (While the court must accept factual allegations as true, it need not credit mere labels, conclusions or "formulaic recitation of the elements of a cause of action."); *EEOC v. Concentra Health Svcs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (The complaint's "allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level;' if they do not, the plaintiff pleads itself out of court."). However, "[a] plaintiff need not put all of the essential facts in the complaint," *Hrubec v. Nat'l R.R. Passenger Corp.*, 981 F.2d 962, 963 (7th Cir. 1992); instead, the plaintiff "may add them by affidavit or brief in order to defeat a motion to dismiss if the facts are consistent with the allegations of the complaint," *Help at Home Inc. v. Medical Capital, LLC*, 260 F.3d 748, 752–53 (7th Cir. 2001); *see Cruz v. Cross*, 2010 WL 3655992, at *2 (N.D. Ill. 2010).

While "detailed factual allegations" are not required, the plaintiff must allege facts that, when "accepted as true, . . . state a claim to relief that is plausible on its

face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal citation and quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563.

Because Count I deals with the Exchange Act, the sufficiency of Plaintiff's claim is also governed by Rule 9(b). *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990) ("It is well settled that Rule 9(b) . . . governs claims based on fraud and made pursuant to the federal securities laws."). Rule 9(b) is intended to force plaintiffs alleging fraud to do more than the usual investigation prior to filing a complaint, and therefore requires such plaintiffs to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *accord Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999). For a complaint to be sufficiently "particular" it must include "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992). In essence, this requires a plaintiff to plead the "who, what, when, where, and how" of the allegedly fraudulent actions. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990); *see Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs.*, 536 F.3d 663, 668 (7th Cir. 2008) (The circumstances of fraud or mistake include the identity of the person

who made the misrepresentation, the time, place and content of the misrepresenta-tion, and the method by which the misrepresentation was communicated to the plaintiff.") (citation omitted).

In addition, a complaint alleging securities fraud is also subject to the height-ened pleading standards set forth in the PSLRA. Under this statute, a securities fraud complaint must specify "each statement alleged to have been misleading, the . . . reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Further, the plaintiff must "state with particularity facts giving rise to a strong in-ference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u-4(b)(2).

## B. Count I—The Exchange Act

### 1. Elements

In Count I, Plaintiff seeks recovery under the Exchange Act and the correspond-ing regulations contained in Rule 10b-5. (Compl. ¶¶ 62–65.) Defendant contends that Count I should be dismissed for failure to state a claim pursuant to Rule 12(b)(6). (Mot. 9.) Defendant argues that Plaintiff has failed to adequately plead any of the necessary elements that comprise a cause of action under the Exchange Act and Rule 10b-5. (*Id.*)

The Exchange Act states in pertinent part that it is unlawful for any person "[t]o use or employ, in connection with purchase or sale of any security . . . any manipu-

lative or deceptive device or contrivance in contravention of such rules and regula-

tions as the [Securities and Exchange Commission] may prescribe." 15 U.S.C. §

78j(b). One such regulation is Rule 10b-5, which, in connection with the purchase or

sale of securities, prohibits: (1) making any untrue statement of material fact; or (2)

omitting the mention of any material fact such that other statements made become

misleading. 17 C.F.R. § 240.10b-5. Rule 10b-5 also provides that it is unlawful to

"engage in any act, practice, or course of business which operates or would operate

as a fraud or deceit upon any person, in connection with the purchase or sale of any

security." *Id.*

To state a valid Rule 10b-5 claim, a plaintiff must allege that: (1) the defendant

made a material misstatement or omission (2) with scienter, (3) in connection with

the purchase or sale of a security, (4) upon which the plaintiff relied, (5) resulting in

economic loss and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 131 S.

Ct. 1309 (2011). Defendant contends that Count I fails to demonstrate any of the

necessary elements that comprise a cause of action under Rule 10b-5. (Mot. 11–46.)

## 2. *Scienter*

A valid complaint must adequately allege that the defendant acted with scienter,

"a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc.

v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Ernst & Ernst v.

Hochfelder*, 425 U.S. 185, 193–94 & n.12 (1976)). Scienter can be shown either

through intentional statements of known falsehoods or through reckless disregard

for the truth. *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th

Cir. 2008). Recklessness in this context "should be viewed as the functional equivalent of intent," *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977), and is defined as an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or was so obvious that the defendant must have been aware of it, *Makor*, 513 F.3d at 704.

As explained above, the PSLRA requires a plaintiff to state with particularity facts giving rise to a "strong inference" that the defendant acted with scienter. 15 U.S.C. § 78u-4(b)(2). The current standard for what constitutes such an inference is the Supreme Court's *Tellabs* decision. The *Tellabs* Court presented three prescriptions for lower courts assessing the sufficiency of scienter pleading in securities fraud cases. First, as with any Rule 12(b)(6) motion to dismiss, courts must accept all factual allegations in the complaint as true. *Tellabs*, 551 U.S. at 322. Second, courts must consider the complaint in its entirety to determine whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id* at 323. Finally, courts must take into account plausible innocent explanations for the defendant's conduct, and a complaint will be sufficient only if the inference of scienter is "*at least as likely* as any plausible opposing inference." *Id*. at 328. In sum, reviewing courts must ask the following question: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inferences?" *Id*. at 326.

Although the Supreme Court declined to apply this new scienter standard to the facts in *Tellabs*, the Court has recently provided such an analysis in *Matrixx*, a case alleging that Matrixx had fraudulently concealed reports documenting a possible connection between its leading product and a consumer health detriment. 131 S. Ct. at 1311, 1323–25. In reaching its decision that the plaintiff had adequately pleaded scienter, the Court weighed the inference that Matrixx had acted recklessly or intentionally in withholding the disputed documents against the opposing inference that the corporation simply did not think the reports contained meaningful information. *Id*. at 1324. The Court rejected Matrixx's argument that because the plaintiff did not allege that Matrixx knew of any statistically significant evidence of detrimental causation, the plaintiff had not sufficiently alleged scienter. *Id*. Instead, the *Matrixx* Court found more compelling the plaintiff's allegations that: (1) the corporation had hired its own consultant and panel of scientists to review the product for the health defect at issue following its discovery of the reports, but did not inform the public of its concerns; (2) that it asked to have animal studies performed on the product after learning of the reports, but still did not inform the public of the concerns; and (3) that it issued a press release suggesting that studies had confirmed that the product did *not* cause the defect when the corporation had not actually conducted any studies and the scientific evidence available at the time was inconclusive. *Id*. Taken collectively, the Court held that these allegations gave rise to a compelling inference that "Matrixx elected not to disclose the reports of adverse events

not because it believed they were meaningless but because it understood their likely effect on the market." *Id*. at 1324–25.

The Seventh Circuit reached a different conclusion when it considered this issue in *Pugh v. Tribune Co.*, 521 F.3d 686 (7th Cir. 2008). In *Pugh*, shareholders of the newspaper publishing company brought suit against the company and five executive officers, among others, alleging that Tribune had committed securities fraud by publically providing inflated newspaper circulation figures that had been exaggerated by a subsidiary attempting to increase its advertising revenue. *Id*. at 690. There was no question that the subsidiary had intentionally boosted figures; the court nevertheless held that the inference that Tribune itself had acted with scienter was not sufficiently cogent or compelling to withstand the defendants' motion to dismiss. *Id*. at 694–95.

The Seventh Circuit explained that even though Tribune had access to the subsidiary's underlying financial information, simply having access does not provide evidence of an intent to deceive. *Pugh*, 521 F.3d at 694. "There is a big difference between knowing about . . . reports from [a subsidiary] and knowing that the reports are false." *Id*. Additionally, although the plaintiffs argued that Tribune's internal circulation controls must have been recklessly weak considering that a fraud actually occurred, the court was clear that this "fraud by hindsight argument" was impermissible and could not be the basis of proving scienter. *Id*. The Seventh Circuit further refused to find a showing of scienter based on the plaintiffs' claim that Tribune was motivated to permit "lax" internal controls to allow the officers to

maximize returns from the exercise of stock options and sales of inflated stock. *Id.* at 695. The court reasoned that for stock sales to constitute evidence of scienter, the sales must be unusual or suspicious, but plaintiffs had provided no evidence of either situation. *Id.* Additionally, because the plaintiffs had merely alleged that stock options were exercised, but had not alleged that those stocks were subsequently sold, the likely inference was that the executives themselves stood to lose a lot of money at the time that this fraud came to light. *Id.* Finally, the Court noted that as soon as Tribune was alleged to have had actual knowledge of the accusations of fraud against the subsidiary, it promptly commenced an internal investigation to discover the truth, promptly terminated the responsible parties, and continuously kept the public apprised of the actions it was taking and the information it was uncovering. *Id.* Tribune did "exactly what they should have done" and the Seventh Circuit therefore held that the plaintiffs' allegations did not add up to a strong showing of scienter that was at least as compelling as an innocent explanation for Tribune's conduct. *Id.* at 694–95.

Here, in dismissing the First Amended Complaint with leave to amend, the court concluded that Plaintiff had failed to give rise to a theory of scienter this was either cogent or sufficiently compelling. Even assuming that Teitelbaum was insolvent in October 2005 and that Defendant misstated and withheld information, the court found it irrational to suggest that Defendant was willing to voluntarily throw away over $333,000 of his own money on a known sham venture for no other reasons than

the possibility of receiving kickbacks valuing less than one third of his initial loan[5]

and the chance to scheme his life-long friend out of his life savings.

The Second Amended Complaint fares no better. Plaintiff contends that "scienter

is clearly evidenced by Defendant's own self-interest, misrepresentations and con-

cealment of material facts." (Resp. 24.) Plaintiff also asserts that "[t]here is no ex-

planation for Defendant's conduct except that he desired to maintain his lucrative

relationship with Teitelbaum at the expense of Plaintiff and Malen. The entire con-

text of the transaction shows that Defendant acted with scienter." (*Id.* 25.) However,

conclusory allegations of intentional or reckless deceit and manipulation are not

enough; the complete story told by the Complaint must back up the allegations to

create the strong inference of scienter required by the PSLRA. *See Tellabs*, 551 U.S.

at 313–14; *Pugh*, 521 F.3d at 694. To that end, Plaintiff claims that Defendant's

culpable state of mind is adequately pled through allegations that: (1) Defendant

was aware that Teitelbaum was having difficulty finding new investors to continue

his investment scheme; (2) Defendant was receiving commissions and other pay-

ments from Teitelbaum as part of Teitelbaum's real estate Ponzi scheme; (3) Defen-

dant made false statements regarding Teitelbaum's wealth and the likely success of

Plaintiff's investment; (4) Defendant falsely claimed that he was an equal investor

in Teitelbaum's real estate venture; (5) Defendant reached an agreement with

Teitelbaum for the commissions only 4 days prior to inducing Plaintiff to invest

$333,000; and (6) Defendant's personal risk was less than Plaintiff's because Defen-

---

[5] The First Amended Complaint claimed that Defendant had received only about $100,000 in kickbacks.

dant was effectively being paid back in numerous other ways. (Resp. 24–27.) The court is not persuaded.

Viewed in its entirety, the Complaint fails to give rise to a theory of scienter that is either cogent or sufficiently compelling. As *Tellabs* makes clear, while the court must accept all factual allegations in the Complaint as true, the court must also consider the Complaint in its entirety and consider plausible opposing inferences regarding Defendant's conduct. 551 U.S. at 322–23. In the end, the inference of scienter must be cogent and at least as compelling as any opposing inference that can be drawn from the facts alleged. *Id.* at 324. Plaintiff contends that Defendant received approximately $200,000 in "kickbacks" from Teitelbaum in exchange for inducing Plaintiff to purchase the Notes. (Compl. ¶¶ 2, 20–22, 34, 39, 42, 46, 52–56, 58 & Exs. B, C, J.) Nevertheless, Plaintiff acknowledges that at the time of his initial loan to Teitelbaum, he and Defendant had been life-long friends and long-time business partners. (*Id.* ¶ 1, 14.) The two were so close that they bought, sold, and managed real estate together, and Defendant even received Plaintiff's mail, was a signatory on one of Plaintiff's checking accounts, paid Plaintiff's bills, and had power of attorney for Plaintiff in certain matters. (*Id.* ¶¶ 1, 14, 15, 17, 60.) Plaintiff also acknowledges that Defendant bought a note from Teitelbaum for $333,333.33 at the same time that Plaintiff made his own purchase. (*Id.* ¶¶ 24, 33.)

Examined holistically, these facts fail to present a cogent or compelling theory of scienter. As the Court concluded in dismissing the First Amended Complaint, it is irrational to believe that Defendant was willing to voluntarily throw away over

$333,000 of his own money on a known sham venture for no other reasons than the possibility of receiving kickbacks valuing about $200,000 and the chance to scheme his life-long friend out of his life savings. Defendant may have misstated information and he may have failed to disclose the kickback arrangement, but there is no coherent theory suggesting that he did so in order to defraud his friend out of over $500,000.

Unlike in *Matrixx*, where the Supreme Court was able to point to numerous and pervasive examples of allegations throughout the complaint that combined to create a strong inference that the defendant corporation withheld the disputed reports with scienter, 131 S. Ct. at 1323–25, here we merely have Plaintiff's isolated claims that Defendant intentionally or recklessly made material misstatements or omissions. The Complaint taken as a whole and the circumstances presented tell a different story. In fact, the instant case is more analogous to the facts in *Pugh* where, as here, the accused parties took actions that provided strong, concrete evidence that they had not been acting with the requisite scienter. Because of actions taken by the defendants such as prompt internal investigations and corrective public disclosures, the *Pugh* Court was persuaded that an innocent explanation for the defendants' statements was more compelling than that they acted with scienter. 521 F.3d at 695. Here, based on the fact that Defendant put over $333,000 of his own money on the table as part of a mutual investment with his life-long friend (Compl. ¶¶ 7–9, 13, 14, 24, 37), this Court is similarly persuaded that Defendant's actions speak to a nonculpable explanation for Defendant's alleged misstatements and omissions. Just

like in *Pugh*, where the Seventh Circuit held that the inference of scienter was be-lied by the fact that the defendants themselves likely stood to lose money as a result of the actions they were alleged to have taken, 521 F.3d at 695, it is not cogent to suggest that Defendant acted with scienter but nevertheless voluntarily set himself up to lose such a large sum of his own money.

Plaintiff's argument that his case is similar to *Matrixx* is unavailing. Plaintiff contends that the *Matrixx* court found scienter "because the defendant had failed to disclose material information of adverse studies concerning on of its products." (Resp. 25–26 (citing *Matrixx*, 131 S. Ct. at 1322).) Thus, Plaintiff argues that De-fendant's failure to disclose his "secret agreements" with Teitelbaum demonstrates scienter. (*Id.* 26.) But Plaintiff refers to the Supreme Court's discussion of material-ity, not scienter. *Compare Matrixx*, 131 S. Ct. at 1322 *with id.* at 1323–24. More-over, Plaintiff ignores the Supreme Court's admonition that "[a] complaint ade-quately pleads scienter under the PSLRA 'only if a reasonable persons would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Id.* at 1324 (quoting *Tellabs*, 551 U.S. at 324). As discussed above, Plaintiff's scienter theory is belied by Defendant's loss of over $333,000 of his own money.

Plaintiff's attempt to distinguish *Pugh* is similarly unavailing. Plaintiff is correct that the *Pugh* court found no scienter after weighing the strength of the plaintiffs' inferences in comparison to plausible nonculpable explanations for defendants' con-duct because defendants conducted a prompt investigation and made full disclo-

sures. (Resp. 26); *see Pugh*, 521 F.3d at 693, 695. Thus, Plaintiff argues that Defendant's failure to disclose his agreements with Teitelbaum demonstrates he was acting with the requisite scienter. (Resp. 26–26.) But *Pugh* does not *require* disclosure to negate scienter. Instead, in following the Supreme Court's admonition to examine plausible, nonculpable explanations, the Seventh Circuit looked to the disclosures in weighing the strength of the plaintiff's scienter arguments. Here, Defendant's failure to disclose his agreements with Teitelbaum does not alter the fact that Defendant invested over $300,000 of his own funds with Teitelbaum—more than he could possibly recover from the alleged kickbacks.

Finally, Plaintiff argues that "even assuming [Defendant] actually did invest money with Teitelbaum, his risk was far less than Plaintiff's because he was effectively being paid back in numerous other ways." (Resp. 27.) Nevertheless, as Defendant aptly states, the "Second Amended Complaint offers no explanation for why [Defendant] would intentionally go to such lengths and make such a personal financial sacrifice to lure his friend into throwing away nearly a half a million dollars."[6] (Mot. 34.)

A much more compelling inference is that Defendant believed that the information he was providing to Plaintiff regarding Teitelbaum and Vision Realty was true and that Defendant in fact intended both he and his friend to make money on their

---

[6] Plaintiff also contends that scienter is evinced by Defendant's awareness that Teitelbaum was having difficulty finding new investors to continue his investment scheme. (Resp. 24; *see* Compl. ¶ 45.) Even assuming that this vague allegation demonstrates scienter, it concerns the time period when Plaintiff renewed the Notes, not when he was purchasing them. (Compl. ¶¶ 43–45.) Thus, this allegation has nothing to do with whether Defendant knew that the Notes were worthless when he initially convinced Plaintiff to purchase them.

investments. Looking at the Complaint in its entirety, it is more plausible that Defendant was as shocked as Plaintiff to learn that Teitelbaum was in fact bankrupt and the promissory notes were worthless.

Plaintiff's allegations of scienter are further undermined by the documents attached to the Second Amended Complaint. The documents indicate that Defendant would not receive his commission/"kickbacks" prior to the "maturity and retirement" of Plaintiff's and Defendant's promissory notes. (Compl. Exs. C, G.) Thus, if Defendant had known Teitelbaum was insolvent in October 2005 as Plaintiff alleges, Defendant also knew that he was never going to see his "kickbacks" because the notes would never be repaid. These documents not only directly undermine Plaintiffs' claim that Defendant was motivated to defraud Plaintiff in order to receive "kickbacks," they also provide further support for concluding that an innocent explanation is more plausible than that Defendant acted with scienter with regard to the Teitelbaum investment.

For all of these reasons, Plaintiff's Second Amended Complaint fails to sufficiently allege scienter, a required element of a valid Rule 10b-5 claim. Because Plaintiff has clearly failed to adequately plead scienter, the court declines to address the remaining five elements of the claim and dismisses Count I. Despite being given an opportunity to amend his complaint, Plaintiff has failed to cure the defects. Accordingly, Count I is dismissed with prejudice.

**B. Subject Matter Jurisdiction**

In Count II, Plaintiff seeks recovery under the Illinois Consumer Fraud Act, and in Count III, Plaintiff alleges that Defendant's actions constitute common law fraud. (Compl. ¶¶ 66–75.) Defendant contends that both counts must be dismissed because the Court lacks subject matter jurisdiction over these state law claims. (Mot. 46–50.)

### 1. Applicable Legal Standard

"It is well established that the burden of establishing proper federal subject-matter jurisdiction rests on the party asserting it . . . ." *Muscarello v. Ogle County Bd. of Comm'rs*, 610 F.3d. 416, 425 (7th Cir. 2010) (citing *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994)). In his Complaint, Plaintiff alleges that subject matter jurisdiction over Counts II and III is proper for two reasons. (Compl. ¶ 3.) First, because Count I constitutes a clear federal cause of action, Plaintiff contends that this Court has supplemental jurisdiction over the state law claims contained in Counts II and III pursuant to 28 U.S.C. § 1367. (*Id.*) However, having dismissed Count I—the sole federal claim—the court exercises its discretion and declines to exercise supplemental jurisdiction over the remaining state-law claims. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."); *Groce v. Eli Lilly*, 193 F.3d 496, 501 (7th Cir. 1999) ("[I]t is the well-established law of [the Seventh Circuit] that the usual

practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial.").

Consequently, we are left with Plaintiff's second basis for subject matter jurisdiction, namely that the court has diversity jurisdiction over the matter pursuant to 28 U.S.C. § 1332. (Compl. ¶ 4.) Such jurisdiction is appropriate only where complete diversity of citizenship exists between a plaintiff and defendant and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a); *Nuema, Inc. v. AMP, Inc.* 259 F.3d 864, 881 (7th Cir. 2001); (*see* Compl. ¶¶ 4, 6–12). Rule 12(b)(1) provides for the dismissal of an action or claim based on the lack of subject matter jurisdiction. Facial challenges require only that the court look to the complaint and see if the plaintiff has sufficiently *alleged* a basis of subject matter jurisdiction. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). In such cases, the motion to dismiss is analyzed as any other motion to dismiss by assuming that the allegations in the complaint are true. *United Phosphorus, Ltd. v. Angus Chemical Co.*, 322 F.3d 942, 946 (7th Cir. 2003).

In contrast, factual challenges to jurisdiction occur when the complaint is formally sufficient but the contention is that there is *in fact* no subject matter jurisdiction. *Apex*, 572 F.3d at 444. For these factual challenges, the court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists. *United Phosphorus*, 322 F.3d at 946; *Villlasenor v. Indus. Wire & Cable, Inc.*, 929 F. Supp. 310, 312 (N.D. Ill. 1996); *see also Gafron Corp. v. Hauser-*

*mann*, 602 F.2d 781, 783 (7th Cir. 1979) ("The district court is not bound to accept as true the allegations of the complaint which tend to establish jurisdiction where a party properly raises a factual question concerning the jurisdiction of the district court to proceed with the action."). The burden of proof on a Rule 12(b)(1) issue rests on the party asserting jurisdiction who must establish the necessary facts by a preponderance of the evidence. *Muscarello*, 610 F.3d.at 424; *United Phosphorus*, 322 F.3d at 946.

Plaintiff asserts that the two parties are citizens of different states—Plaintiff of Illinois and Defendant of Florida. (Compl. ¶¶ 4, 6–13.) Defendant, however, contends that he is not a citizen of Florida but is also a citizen of Illinois. (Mot. 47, 49–50.)

### 2. Analysis

An individual is a citizen of the state where he or she is domiciled—the state he considers his permanent home. *Galva Foundry Co. v. Heiden*, 924 F.2d 729, 730 (7th Cir. 1991); *see Dakuras v. Edwards*, 312 F.3d 256, 258 (7th Cir. 2002) ("Citizenship for purposes of the diversity jurisdiction is domicile, and domicile is the place one intends to remain . . . ."). In *Galva*, an Illinois corporation brought a cause of action against an alleged Florida citizen. 924 F.2d at 729–30. The defendant was born and raised in Illinois and had lived and worked in Illinois until shortly before the events giving rise to the lawsuit. *Id.* at 730. He also owned a second home in Florida, which he and his wife used as a vacation home. *Id.* The defendant spent several months at a time in Florida, dividing the rest of the year between Illinois and Europe. *Id.* He

maintained his home in Illinois, as well as his memberships in a country club and church. *Id*. One year before the lawsuit was filed, the defendant registered to vote in Florida, obtained a Florida driver's license, stated in an application for a Florida tax exemption that he was a permanent resident of Florida, and listed his Florida address as his permanent address on both his federal and Illinois income tax returns. *Id*. He did all of these things for tax purposes, as Illinois taxes were higher than Florida taxes, at least for Florida residents. *Id*.

The district court dismissed the cause for want of subject matter jurisdiction, concluding that the defendant was a citizen of Illinois, rather than of Florida. *Galva*, 924 F.2d at 729. In affirming, the Seventh Circuit initially considered the primary rationale for federal diversity jurisdiction, which is to "protect nonresidents from the possible prejudice that they might encounter in local courts." *Id*. at 730. This rationale supported a finding that the defendant was a citizen of Illinois, as he was a "long-time resident of Illinois and unlikely therefore to encounter hostility in its state courts." *Id*. Furthermore, the defendant was the party arguing against federal jurisdiction; the plaintiff, who was undisputedly a citizen of Illinois, was the one who wanted to be in federal court. *Id*.

The Seventh Circuit also considered the defendant's intent to continue to spend most of the year in Illinois. *Galva*, 924 F.2d at 730. At the time the lawsuit was filed, the defendant "intended no change in the manner or style of his life, the center of gravity of which was and remain[ed] in [Illinois], but only a change in his tax rate." *Id*. The Seventh Circuit concluded that the plaintiff's argument that the de-

fendant "had residences in two states and by his actions chose one of them—Florida—to be his domicile is unacceptable because it makes changing one's domicile too easy. Anyone with residences in two or more states could change domicile continually, by changing his voter registration or his driver's license, in order to take advantage of changes in tax law or to opt in or out of federal diversity jurisdiction." *Id*. The defendant's actions, which he took only for tax purposes and not because he actually intended to change his domicile, "cannot convert a suit between two residents of Illinois into a suit against a Floridian." *Id*. at 731 (The defendant "did not want to change his domicile. He just wanted to fool the taxing authorities in Florida and particularly Illinois (for it was Illinois taxes that he was trying to escape) into thinking he did. This is shady business but it cannot convert a suit between two residents of Illinois into a suit against a Floridian.").

The factual allegations here are similar to *Galva*. Beginning in 1996 and continuing until at least 2005, Defendant was a licensed real estate broker who bought, sold and managed real estate in Illinois with Plaintiff as his partner. (Compl. ¶¶ 14–15, Exs. B–D, G.) Defendant resides at 1325 W. Greenleaf Avenue in Chicago, Illinois, where he has lived at all times relevant to this lawsuit. (Mot. 50, Ex. B.) At the time this action was filed, Plaintiff had a vehicle registered to him in Illinois and was served the summons and complaint at his Chicago residence by delivering them to his wife who was home at the time. (*Id.* Ex. C.)

Accepting as true the factual allegations in Plaintiff's Complaint and drawing all inferences in his favor, as the Court must do on a motion to dismiss, *Killingsworth*,

507 F.3d at 618, Plaintiff has merely alleged that Defendant has taken various actions to establish a residence in Florida "for tax purposes" (Compl. ¶¶ 8–13). Defendant owns real estate in Florida, is registered to vote in Florida, maintains a Florida drivers license, has several automobiles registered in Florida, and is the beneficiary of a Florida living trust. (*Id.*) Nevertheless, Plaintiff acknowledges that Defendant took these actions merely to establish a residency in Florida for tax purposes. (*Id.* ¶ 9.)

As in *Galva*, these facts are insufficient to establish an intent by Defendant to change domiciles. Defendant was clearly domiciled in Illinois during the time period of the actions described in the Complaint. He bought, sold and managed real estate in Illinois with Plaintiff as his partner (Compl. ¶¶ 14–15, Exs. B–D, G) and resided in Chicago (Mot. Exs. B, C). At the time this action was filed—the time period that is critical for determining citizenship, *Sadat v. Mertes*, 615 F.2d 1176, 1180 (7th Cir. 1980)—Defendant's residence was in Chicago, where he also had a vehicle registered in his name. That Defendant also took steps to establish residency in Florida "for tax purposes" is insufficient to evince an intent by Defendant to change domiciles. As the *Galva* court found, Defendant's actions may be "shady business but it cannot convert a suit between two residents of Illinois into a suit against a Floridian." 924 F.2d at 731.

Finally, as the Seventh Circuit observed in *Galva*, Defendant's long term residency in Illinois weighs against maintaining this lawsuit under the diversity jurisdiction, "a jurisdiction whose main contemporary rationale is to protect nonresi-

dents from the possible prejudice that they might encounter in local courts." 924 F.2d at 730. This rationale argues for finding Defendant to be domiciled in Illinois. He is a long-time resident of Illinois and, therefore, unlikely to face hostility in the state courts. Further, Defendant is not seeking the "protection" of the federal courts from state court prejudice. It is Plaintiff who seeks diversity jurisdiction; yet Plaintiff is indisputably an Illinois citizen. (*Id.* ¶ 6; *see* Mot. 47.)

Plaintiff's attempt to distinguish *Galva* is unavailing. He argues that in *Galva*, "there was no question that at the time of the occurrence of the events alleged in the lawsuit, defendant was a citizen of Illinois; the issue was whether he had changed his domicile to Florida by moving there," and here, "there is no evidence that Defendant has made Illinois his domicile for his entire life." (Resp. 31.) Yet, as Plaintiff himself has acknowledged, "[d]iversity of citizenship is determined at the time the lawsuit was filed." (*Id.* 30.) In any event, the court finds Defendant's actions establishing a residence in Florida for tax purposes to be insufficient to establish an intent to establish Florida as his domicile. Plaintiff has not met his burden to establish by a preponderance of the evidence that Defendant intended to change his domicile from Illinois to Florida. *See Muscarello*, 610 F.3d.at 424.

In sum, the court concludes that diversity jurisdiction does not exist in this case because there is not complete diversity between Plaintiff and Defendant. Further, because the court has dismissed the sole federal claim, the court declines to exercise supplemental jurisdiction over the remaining state-law claims. Accordingly, Counts

II and III are dismissed without prejudice. Plaintiff may pursue these state claims against Defendant in state court.

### III. CONCLUSION

For the reasons set forth above, the Court **GRANTS** Defendant's Motion to Dismiss [49] and enters final judgment in favor of Defendant. Count I of the Second Amended Complaint is **DISMISSED WITH PREJUDICE**. Counts II and III of the Second Amended Complaint are **DISMISSED WITHOUT PREJUDICE**.

E N T E R :

Dated: November 30, 2011

NAN R. NOLAN
United States Magistrate Judge